LANE et al. v. URBAHN.   (No. 6815.)

(Court of Civil Appeals of Texas. San Antonio.  Nov. 22, 1922.  Rehearing Denied Jan. 3, 1923.)

1. **Mines and minerals** ⬥58—Evidence held insufficient to show representations as to the financial ability of men owning lessee company, etc., were false and fraudulent.

In a suit to cancel a lease, held, that the evidence was insufficient to show that representations that the oil and gas company lessee was owned by men of large wealth who had sufficient means to develop the property sought to be leased, and would so develop the same, were false and fraudulent, considering the purposes disclosed by the contract, and that the term "large wealth" is a relative term the meaning of which depends on the connection in which it is used.

2. **Mines and minerals** ⬥58—Alleged fraudulent representations that lessees did not intend to acquire contract for peddling held not to support action for rescission.

Alleged fraudulent representations that proposed lessees did not intend to acquire the contract for peddling purposes will not support an action for rescission, where the written contract expressly stipulates that lessees had a right to assign the lease "in whole or in part," and there is no contention that this provision was inserted by fraud, accident and mistake.

3. **Mines and minerals** ⬥79(2)—Default in performance of implied obligation of lessee held not to warrant cancellation of lease.

Where the contract expressly provided that, if the lessee failed to begin drilling a well on or before a stipulated date, the lease should terminate unless lessee paid the stipulated rental, but in no other contingency was a forfeiture expressly provided for, failure to mine and operate in good faith and with ordinary diligence in accordance with the implied obligation of the lessee does not warrant cancellation, but merely an action for damages.

On Motion for Rehearing.

4. **Contracts** ⬥99(3)—To warrant rescission of written contract fraud must be definite, explicit, and clearly proven.

Representations, in order to constitute fraud and deceit warranting the cancellation or rescission of a solemn written contract, must be definite, explicit, and clearly proven.

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Action by Albert Urbahn against L. M. Lane and others to cancel an oil and gas

lease. From a judgment for plaintiff, defendants appeal. Reversed and remanded.

Hicks, Hicks, Dickson & Bobbitt, of San Antonio, and John L. Dannelley, of Laredo, for appellants.

J. D. Dodson, of San Antonio, and A. R. Smith, of Laredo, for appellee.

SMITH, J. On February 24, 1919, Albert Urbahn and another executed to the Rio Grande Oil & Gas Company an oil and gas lease upon a body of land, comprising about 53,000 acres, situated in Webb county. A second lease, in confirmation of the first, was executed by the parties on May 22, 1919. On May 26, 1921, Urbahn brought suit to cancel the lease, or for damages in lieu of cancellation, upon the grounds that the same had been procured through the fraudulent representations of the lessee, and the lessee had failed in its obligation to develop the land for oil and gas. A trial before the court, and without a jury, resulted in a judgment canceling the lease.

The lease in controversy was for a term of five years, and as long thereafter as oil or gas, or either of them, is produced in paying quantities; the recited consideration being $5,314, which it is conceded was paid in cash at the time the contract was executed. Among other provisions in the lease contract were the following stipulations:

"If no well be commenced on said land on or before the 24th day of February, 1920, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the Milmo National Bank at Laredo, Tex., or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of $3,321.25, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 3 months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for a like period of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down-payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above-described land be a dry hole, then, and in that event, if a second well is not commenced on said land within 12 months from the expiration of the last rental period which rental has been paid this lease shall terminate as to both parties, unless the lessee on or before the expiration of said 12 months shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments.

"If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors, or assigns.

"Lessee and his assigns agree to use all reasonable efforts known to or practiced by competent oil producers to commence a well on the land herein within six months from the date hereof.

"But it is expressly stipulated and understood that the lessee herein guarantees on the part of its assigns the full and faithful compliance of all the covenants and obligations imposed on the original lessee herein."

It was alleged by Urbahn that it was his intention to lease the land in controversy only to persons or corporations desiring and financially able to develop the oil and gas resources of the land, and who would not, after procuring the lease, peddle it out in smaller portions by assignment to others; that Lane, with whom Urbahn dealt, knew these facts when he negotiated the lease, but in spite of this knowledge falsely represented to Urbahn that the appellant company was solely owned by individuals who had in a wide experience in the oil and gas business acquired large wealth, which was available to them for the purpose of developing this property; and that if the lease was secured they would in fact develop it, and "did not intend to acquire such contract for peddling purposes." The court found that the three individuals to whom Lane referred were worth $100,000, $125,000, and $100,000, respectively, which they had earned principally in the oil and gas business, but that they were not men of "large wealth," as represented, and did not provide the company with sufficient funds to properly develop the land, and that the lease was taken by them for speculative purposes through the sale of subleases at a large profit. It will be necessary to discuss and dispose of these representations and findings separately, which will now be done.

[1] The representation first alleged was that the oil company was owned by men of large wealth which they had accumulated in the oil and gas business, and had sufficient means to enable them to develop the property sought to be leased, and would so develop it. The court found these allegations to be true, and the representations to be false. To say that any one is possessed of "large wealth" is an indefinite declaration, the meaning of which must be ascertained, not by the application of any general rule, but from the status of the particular individual, the relation he bears to the facts and circumstances inducing the declaration, and the particular undertaking contemplated by the parties to and from whom the declaration is made. "Large wealth" is peculiarly a relative term. In Wall Street it may mean many millions:

in "Main Street" it may mean a very few thousands. If used in connection with large industrial projects it may mean hundreds of thousands, or even millions; whereas, if it is used in connection with a small mercantile operation it could very easily comprehend only a few thousands—depending in each case upon the nature and magnitude of the project in mind. Here the parties had in mind the primary purpose of ascertaining if oil or gas underlay the lands in controversy, and the meaning of the term "large wealth" must be determined by the nature and extent of that undertaking. If the parties contemplated sinking a large number of wells upon the land, thus exploring the whole of the tract, regardless of whether either operation resulted in the discovery of oil or gas, then of course the project involved the expenditure of hundreds of thousands of dollars. But if the undertaking involved the sinking of one or two wells, which, if dry, would result in an abandonment of the project at the option of the lessee, then a very much less amount would be required for the test. If the first plan was in the minds of the parties, then the use of the phrase "large wealth" must have meant a sum of money amply sufficient to finance the undertaking, but if the second plan was the one in mind, then the meaning of the term should be tested by the financial requirements of the smaller undertaking. The purpose of the parties, and the significance to be given the term "large wealth," must be determined, then, by the conduct of the parties in relation to the transaction. The oral declarations, promises, agreements, and negotiations of the parties prior to the execution of the contract, even if they could be given an effect at variance with the written agreement, were not sufficiently definite to afford a basis of a clear or fixed understanding. We are relegated, then, to the written agreement to ascertain the purposes of the parties. If that agreement did not express such purposes, or if the latter cannot be clearly implied therefrom, then the question would be one for court or jury to determine from all the other facts and circumstances in evidence. But an examination of the written contract will disclose that it did in terms express the obligations of the lessee in the undertaking, and, that being true, we need not go behind that contract, even if authorized to do so, in order to ascertain what those obligations are.

In the first place, the lessees were required, not to drill wells in every portion, or in any particular portions, of the land, but they were required to drill only one well at a time, and the obligation to drill even one well could be deferred from time to time by the payment of a fixed rental. The highest estimate of the probable cost of completing the initial well under this contract was $100,-000. The probable relative cost of subsequent wells was not shown. The initial well had been sunk to a depth of 1,600 feet, at a cost of $65,000. It was shown that a very large proportion of the expense was incurred in preparation for the beginning of the well, which was far distant from railroads, at a point without water or other practical facilities. It does not affirmatively appear, but may be assumed from common knowledge, that in event of drilling other wells in the vicinity, much of the cost incident to the initial well would be eliminated. But the record warrants the inference that several wells could be completed by the use of the wealth the court found the operators possessed. The undertaking assumed by the company owned and operated by these individuals was, as stated, to drill, or pay rentals in lieu of drilling, according to their judgment in the premises. Under the terms of the contract they could abandon the project by failing to drill or pay rentals, but so long as they did either in accordance with the contract provisions, the contract remained in force. If they chose to drill, they possessed the wealth which would enable them to do so; if they chose to pay rentals in lieu of drilling as they had the right to do as long as the minerals were not jeopardized by drainage into offset wells, they had sufficient means to do so throughout the lease period. It does not stand to reason that the parties contemplated that the operators would continue to spend large sums of money in further explorations, in event the first wells proved to be dry holes. The land was in "wild cat" territory, 75 miles removed from producing wells, and it will not be assumed that the operators would drill any considerable number of successive dry holes, or continue to pay heavy rentals after the territory would be thus disproven. Of course, if the first well, or the first few wells, should be paying producers, the proceeds therefrom would automatically finance further development. But it is obvious from the provisions of the contract, as well as from the oral testimony, that the purpose in the minds of lessor and lessee was to test the land for oil and gas, by drilling one well at a time, as expressly provided, and that the initial undertaking contemplated was the drilling of only such wells as were necessary to prove or disprove the territory embraced in the lease. The truth or falsity of the representation of Lane that his associates were men of "large wealth" must be tested by its relation to the undertaking the parties had in mind, and when that is done it cannot be said as a matter of law or fact that this representation meant that the operators were financially worth more than $325,000, which the court found they possessed. At most, the representation was vague and indefinite, and in order to impute fraud to the maker of it the evidence should be clear, and the disparity between it and the actual condition shown to be definite and substantial. Certainly no

such case is presented here, and the conclusion of the court that the representation complained of was false is not only without support in the record, but is contradicted by the finding that the parties were worth as much as $325,000. For the same reasons, the finding of the court that the representation, that the proposed operators did not have sufficient funds to finance the development contemplated, was false and fraudulently made, is contradicted by the record as well as by the finding mentioned.

[2] The remaining representation which was alleged to be false, and upon the falsity of which appellee sought rescission, is that the proposed lessees "did not intend to acquire such contract for peddling purposes," to quote the language of the petition. It was alleged that this allegation was false, "in that [the lessees] were acquiring said lease from the plaintiff for the purpose of peddling and assigning leases, .and thereby reaping large rewards for themselves." The finding of the court corresponding most nearly to these allegations was that the person negotiating the lease for the company represented that he and his associates "did not intend to, and would not sublet any of said lands to persons for any purpose other than good-faith development of said lands for oil and gas and to persons who were financially able to do so." There is a variance between the language of the court's finding and the allegations in the petition, as will be readily seen, and appellants complain of this variance, insisting that it is material and that the allegation and finding do not co-ordinate, and neither supports the other. Pretermitting a discussion or decision of this point, we will say that we do not think the fraudulent representation alleged will support an action for rescission in this case, for the reason that it was expressly stipulated in the written contract that the lessees had the right to assign the lease, "in whole or in part." There is no contention that this provision was inserted in the contract by reason of any fraud, accident, or mistake, and thus it stands as an affirmative, voluntary expression of the will of both parties, and is of equal dignity with every other provision in the instrument. If, before entering into the written contract, the parties had any agreement or understanding giving, regulating or withholding the right of the lessees to assign the lease, such agreement or understanding is presumed to have been merged into the stipulations relating thereto and embraced in the written instrument, which thus became the full and final expression of the parties with reference to that particular subject, and this expression cannot be abrogated or modified except by a reformation of the instrument upon allegations and proof that it was incorporated therein through fraud, accident, or mistake. If the contract had been silent upon the question of assignment, or if the provision relating thereto had been ambiguous, then upon proper pleading it is possible that the real intention of the parties could have been shown by parol testimony and given effect. But here the provision for assignment is plain and unambiguous, and clearly provides that the lease may be assigned, either in whole or in part. It will be presumed that if the parties desired any further modification of the right to assign, they would have incorporated it into the provision deliberately written upon the particular subject, and to which they will be held in the absence of a showing that that provision was inserted through some fraud, accident, or mistake.

[3] In its conclusions of law, the court below also found that the lessees and sublessees failed to "mine and operate for oil and gas on the land in controversy in good faith or with ordinary diligence," and held by reason of this default the lessor was entitled to a cancellation of the lease. Appellants contend, and appellee in effect concedes, that the findings of fact do not warrant the cancellation upon this ground. The contract expressly provided that if the lessees failed to begin drilling a well on or before February 20, 1920, the lease should terminate, unless the lessee paid the stipulated rental; but in no other contingency was a forfeiture expressly provided for. The evidence showed, and the court found, that the lessee began drilling a well within the time stipulated, thus avoiding the only forfeiture expressly provided for. The obligation of the lessee to diligently and in good faith fully develop the land was implied, but not expressed. It is now settled in this state that where a lease contract of this nature expressly fixes conditions upon which the contract may be canceled, or avoided, the default of the lessee in the performance of an implied obligation does not warrant cancellation, but merely an action for damages; or, where the default is persisted in, it will, under some circumstances, warrant cancellation on the theory of abandonment. This contingency is not presented in this case, however. Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464.

The judgment is reversed, and the cause remanded.

### On Motion for Rehearing.

In his motion for rehearing, appellee assumes that this court was influenced in its opinion by an erasure of certain assignments originally appearing in appellants' brief, and by a suggestion in appellee's brief that there was no index in appellants' brief. The suggestion mentioned made no impression whatever upon this court, and the erasure in appellants' brief served only to relieve us of considering the assignments erased, and appellee's replies thereto. No significance whatever was given either circumstance.

246 S.W.—68

Appellee also complains of the statement in the original opinion that—

"Appellee in effect concedes that the findings of fact (that the lessees failed to mine and operate for oil and gas on the land in good faith or with ordinary diligence) do not warrant cancellation upon this ground."

Appellee has misconstrued the purpose of that statement, and this is no doubt due to the inapt language in which it was expressed, which is the fault of the writer. By this statement it was intended to say that appellee in effect concedes that the evidence and findings of fact do not warrant cancellation of the lease on account of a breach of the express or implied contractual obligation of appellants to develop the land in controversy, for the reasons given in the concluding paragraph of the original opinion, and in accordance with our interpretation of the Grubbs v. McAfee Case.

Appellee complains somewhat bitterly of the holding in the original opinion that the alleged fraudulent representations of appellants' agent, Lane, as to the financial ability of appellants, and as to their purpose to devote that ability to the development of the land, were not shown to be of such nature as to warrant cancellation on that account. In reiterating our holding, we deem it proper to quote the testimony of appellee Urbahn and his agent and attorney, Cogley, who in Urbahn's behalf negotiated the contract with appellant. Cogley testified with reference to Lane's representations:

"He (Lane) stated that they (Lane's associates) were not desirous of subleasing the property, that his associates had recently sold their holdings in Oklahoma for something like $34,000,000. He claimed that there was no desire to—that it would not be necessary for them to sublease, as his people had ample funds to go on with this development. * * * I conveyed to Judge Lane Mr. Urbahn's attitude with reference to giving a lease on this land to parties who were not capable of in good faith developing it, or I would not have submitted it to Mr. Urbahn, unless he had given me an assurance that they only wanted the lease to develop the land. When Judge Lane made these representations to me as to their ability and intention to develop the land, I, in good faith, believed that he was associated with such people and who had such intentions. I would not have submitted this lease to Mr. Urbahn if I had doubted Judge Lane's statements in that regard. * * * If Judge Lane had told me before he procured this lease from Mr. Urbahn that he was playing the oil game of the kind that he told me afterwards that he had, I would not have submitted it to Mr. Urbahn. * * * I conveyed to Mr. Urbahn those statements of Judge Lane with reference to his ability or the ability of his company to develop the land. It was the basis on which the proposition was submitted to Mr. Urbahn."

Appellant Urbahn's testimony upon this point was that—

"With reference to how I conversed with Mr. Lane and how I negotiated with him before I signed this lease, I would say, knowing that Mr. Lane was in search of leases for development, I told him I was willing to lease to responsible parties with sufficient capital to develop, and that I would not lease to any parties who were not financially capable of developing the tract, and he stated that the parties behind him were millionaires who had sold out their interests for many millions—over $34,000,000, he stated, in the state of Oklahoma—and they were fully able to carry out the development of that tract. * * * I told Mr. Lane that I would not make leases on my land to parties who were not financially capable of in good faith developing it. In response to that, Mr. Lane said that his backers were millionaires who had disposed of their interest in Oklahoma for over $34,000,000. Prior or to the execution of the lease, other than talking to Mr. Lane, I talked with Mr. Cogley, my attorney, with reference to these matters, and Mr. Cogley told me things that Mr. Lane had said. As to whether I had formed any opinion in my mind before executing this contract with reference to the good-faith statements of Mr. Lane as to the financial ability of his concern to develop my land, I would say I saw no reason to doubt his statements. I was favorably impressed with his appearance. If I had not believed that Mr. Lane and his associates or his concern were capable of financing the land, I would not have given him the lease contract. As I stated to him and to others at the time, I would give no lease to any one who was not financially capable of developing the land. * * * Well, when the inquiry began in this section about the prospects of oil and people began to lease, I was willing to lease provided I could find proper responsible parties, and I stated to Judge Lane, who talked to me about the Santo Tomas lease, that the lease money of $5,000—at 10 cents an acre was not the consideration—was the least consideration, in transferring the lease. That 10 cents an acre was nothing to induce me to enter into a lease contract, but that it was the development of the land, and that I would only give it to financially responsible parties who intended to drill for oil. In response to that, Mr. Lane said that his backers were fully able to develop the land. * * * I had given the lease on the assertion of Judge Lane that the parties behind it were strong and were going to drill and develop that land. * * *"

[4] The maximum effect that may be given the representations shown in the foregoing testimony to have been made by Lane is that his associates were at that time financially able to exploit the oil and gas underlying appellee's lands, and that they intended to so develop the lands. There was no agreement as to how much money would be required in the proposed development, nor was there any agreement or intimation from either party as to what development was contemplated or was necessary to exploit the land. While it was understood, of course, that if the lease was made it involved development of the land, the extent of such development was not

discussed, but was left for determination in the subsequent written contract. Representations, in order to constitue fraud and deceit warranting the cancellation or rescission of a solemn written contract, must be definite and explicit, and clearly proven. Certainly the false representations of Lane, as shown by the quoted testimony, do not meet this test. He represented that his associates at that time were financially able to develop appellant's land, and intended to so develop it. The nature and extent of this development was very clearly fixed in the contract.

Appellee in no sense met the burden imposed upon him of showing that appellants were not originally, or are not now, financially able to prosecute the development so provided for. Appellee complains that the record does not support the statement in the original opinion that the highest estimate of the probable cost of the first well was $100,-000. This statement was based upon the testimony of the principal promoter of the development that as much as $100,000 should be set aside for use in drilling the first well, in order to be on the safe side. No other estimate seems to have been made for this purpose. If the proof of this fact was uncertain, the uncertainty militated against appellee, upon whom the burden rested to clearly show the elements of fraud upon which he relied for rescission. So, if the proof of the probable cost of the first well, or of the total cost of development, was lacking or was uncertain, appellee is not in a position to complain, as the burden of that proof rested upon him.

Appellee also complains of the holding in the original opinion that the provision in the lease contract that the lessee was authorized to assign the lease, in whole or in part, superseded any representations or agreement concerning the privilege of the lessee to assign. We reiterate that holding, and in doing so quote the testimony of appellee and his agent, Cogley, upon that phase of the case, in which they show their conversation and understandings with Lane, appellant's agent. Cogley testified:

"He (Lane) stated that they (Lane's associates) were not desirous of subleasing the property; that his associates had recently sold their holdings in Oklahoma for something like $34,000,000. He claimed that there was no desire to—that it would not be necessary for them to—sublease, as his people had ample funds to go on with this development, and it struck me as in line with Mr. Urbahn's idea on which he wanted to lease, and it was on that I submitted it to Mr. Urbahn. The consideration was small and was the least proportion of the proposition made by Judge Lane for the lease on the land. The form of lease which he submitted for signature, and which I referred to Mr. Urbahn, was not sufficiently full, and I think you will find that there is a clause in Judge Lane's own handwriting there which was added to the lease, because he wishes to use this regular form which I think is the form approved—this is not a printed form, but was copied from it (referring to copy of the lease used in evidence handed witness by counsel), and the wording of this is in line with Mr. Urbahn's instructions to me, and practically dictated by me, but written by Judge Lane, and is intended simply to cover the portion of the form of lease which gives them a right to sublease, and in speaking of subleasing I only had in mind the subleasing of the whole, and Mr. Urbahn said they might sublease and not assume the obligation to develop, which was the main object in making the lease. I certainly did explain that to Judge Lane, and he said he had no objection to adding this and took my pen and wrote this on my desk at my dictation. Judge Lane wrote that at my dictation, that if they did sublease that those lessees would carry on the development just as he agreed to. * * * The second lease was executed with the addition which I mentioned, for the purpose of making it satisfactory to Mr. Urbahn."

Appellant Urbahn testified:

"The original contract and the one that was executed in May are identical with the exception of this penned paragraph additional here. I will state how I happened to have this second contract with that pen addition put on it. This article of the contract which followed the usual form, I believe, of what they called the Texas contract, 'If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns,' but that does not state that the grantee in this lease would be responsible for the companies to which they were transferred and knowing that the oil business was not only full of ups and downs, but of people who were up to all sorts of manipulation, I thought it would be better to protect myself by adding this, 'But it is expressly stipulated and understood that the lessee herein guarantees on the part of its assigns the full and faithful compliance of all the covenants and obligations imposed on the original lessee herein,' believing that these grantees were the millionaires that Lane asserted were behind them, and therefore fully capable of guaranteeing their assigns—guaranteeing that their assigns would develop it. * * * If Mr. Lane had told me that the company was going to peddle leases to people who were not oil people or capable of developing, I certainly would not have given him a lease with an assignment clause in it, because that very fact would show that they were not financially able to develop this except on receipts from peddled leases. Long afterwards, or shortly afterwards, he said that he was trying to interest friends, strong friends financially able to help develop the tract. I was perfectly willing to have him do it, because the more wells the better for me. * * * I executed two leases, but it was practically only one; the first was February 24 and the other May 22, 1919. Those are the only two instruments I executed. In both of those instruments I knew that the company with whom I was dealing had a right to assign leases, but I make that distinction. At that time Mr. Lane did not make the promise

that they would only be assigned to people with ability to develop, but it was afterwards that he told me that he would like to get friends who were financially strong and responsible to join him in developing the land, which of course I conceded. At the time he made the lease nothing was said to me about that, but it was afterwards that he told me about it. I executed both of these leases before he made that statement to me."

It will be seen from the foregoing testimony of both appellee and his agent who negotiated the lease that Lane made no affirmative inducing representations to appellee about the purpose of the lessees to assign, while to Cogley, appellee's agent, he stated that his associates "were not desirous of subleasing the property," that "there was no desire to—that it is would not be necessary for them to—sublease, as his people had ample funds to go on with this development." It is extremely doubtful if these statements were sufficiently definite or affirmative to warrant rescission based upon the falsity thereof; but whether they were so or not, appellee, in order to clearly fix the obligations, rights, and privileges of the lessees with reference to the unqualified right of assignment provided for in the form of contract presented to him, dictated the terms of the supplemental clause appended to the contract, thereby expressing in his own language his interpretation of the restrictions he intended to place upon appellant's right to assign.

The motion for rehearing will be overruled.