MIDDLE STATES PETROLEUM CORP.
et al., Appellants,

v.

John MESSENGER and R. J. Whelan,
Appellees.

No. 16228.

Court of Civil Appeals of Texas.

Dallas.

May 3, 1963.

Rehearing Denied June 7, 1963.

Joe W. Lovelace, Linden, Smead & Harbour, Longview, for appellants.

Baldwin & Baldwin, Scott Baldwin, and John E. Taylor, Marshall, for appellees.

WILLIAMS, Justice.

This appeal, being from a judgment of a District Court of Cass County, Texas, was originally in the Court of Civil Appeals for the Sixth Supreme Judicial District of Texas at Texarkana but has been transferred to this Court by order of the Supreme Court of Texas.

The suit was filed by Whelan and Messenger against Middle States Petroleum Corp., Midstates Oil Corp., Tennessee Gas Transmission Co., and a large number of royalty owners, in the form of trespass to try title seeking to cancel the assignment of a certain oil and gas lease insofar as same covered 108.4 acres out of the Joseph Watkins Survey in Cass County, Texas. Trial was to a court and a jury. The court, based upon answers of the jury to special issues which will be hereinafter discussed in detail, rendered judgment in favor of appellees cancelling the oil and gas assignment covering the entire 108.4 acres in question.

## FACTS

Prior to December 1942 Whelan and Messenger were the owners of several oil and gas leases in Cass County, Texas covering a large number of acres of land. One lease, 228.4 acres in extent contains the 108.4 acres in controversy herein. On December 26, 1942 Whelan and Messenger assigned to Midstates Oil Corporation the 228.4 acre lease which includes the specific 108.4 acres now in question. This assignment contains the specific provision with reference to a drilling program and protection from drainage. Inasmuch as this controversy revolves around this provision of the assignment, being paragraph 6, it is here copied in full:

"ASSIGNEE agrees that if a well or wells are completed as commercial producers and offsetting the portion of the leases herein assigned, ASSIGNEE will, within ninety (90) days from the date that it receives notice and proof from ASSIGNOR that an

offset well has been completed as a commercial producer, begin actual operations for the drilling of a well to protect said offset, or at the end of the said ninety (90) day period, reassign that portion of the lease that is due an offset on account of such commercial producer. In the event of such reassignment, Assignee shall be relieved of all liability as to such re-assigned acreage. Except as herein provided, ASSIGNEE shall not be required to drill and develop the land covered by said leases on account of the overriding royalty herein reserved by ASSIGNOR, and any operations upon said leases, as well as preservation of said leases, shall be at the will of ASSIGNEE."

The lease assigned, as well as the material surrounding area, is revealed by the following map, known as Exhibit A attached to appellants' brief.

The original lease is enclosed in the heavy lines and the 108.4 acres in controversy is shown within and designated by the words "Joseph Watkins".

Subsequent to the execution of the assignment of December 26th, 1942, the Texas Company, which was the owner of a 100 acre lease immediately to the west of

the 228.4 acres, drilled and completed thereon The Texas Company-Benefield & Singleton Well #3. Appellants thereafter assigned 40 acres out of the northwest portion of the 228.4 acres to J. C. Trahan, who drilled an oil well known as Trahan #1.

The Texas Company thereafter completed its Benefield & Singleton Well #4 and on March 26th, 1957 completed its Benefield & Singleton Well #5 as shown on Exhibit A. Killingsworth, who was the owner of the Elias Harper Estate 106½ acre tract immediately adjacent to the southern most west line of the 228.4 acres, drilled and completed an oil well thereon known as the Killingsworth-Elias Harper Estate Well #A–1.

After the completion of The Texas Company-Benefield & Singleton Wells Nos. 4 & 5, and the Killingsworth-Elias Harper Estate Well #A–1, appellants commenced operations for the drilling of a well on the said 228.4 acres to protect the same from drainage and completed its Midstates Well #C–1 on July 7th, 1957.

Midstates drilled still another oil well on the southern portion of the said 228.4 acre tract known as the Midstates Well #C–2, completing same on August 2nd, 1957.

Killingsworth was the owner of the Elias Harper Estate 120 acre lease immediately to the east of said 228.4 acre tract. On July 29th, 1958 he completed the Killingsworth-Elias Harper Well #E–1.

Killingsworth was also the owner of the Anna Louise Alvarez 133.8 acre lease immediately to the east of the 228.4 acre tract. On November 2d, 1958 he completed the Killingsworth-Alvarez Well #A–2 and on February 9th, 1959 completed the Killingsworth-Alvarez Well #A–3, as shown on Exhibit A.

It is undisputed in this record that Whelan and Messenger made numerous demands upon appellants for development of the acreage in question extending over a period from March 29th, 1957 until June 24th, 1959. On March 29th, 1957 Whelan addressed a demand letter to appellants stating that "several wells offsetting" the property existed and called upon appellants to comply with paragraph 6 of the assignment by drilling offset wells or reassigning that portion of the lease affected by the well or wells in question. No specific wells were pointed out or any proof attached to said letter. On November 23, 1957 Whelan's letter to appellants specifically pointed out that Killingsworth-Elias Harper Estate Well #A–1 had been completed on May 2, 1957 and demanded an offset well be drilled or a re-assignment made. Attached to this letter was Railroad Commission Forms showing a potential production test of said well. On November 23, 1957 Whelan's demand letter to appellants related that Texas Company-Benefield & Singleton #5 had been completed, attaching Railroad Commission Forms showing potential production test as sixty-eight barrels per day and demanding a compliance with paragraph 6 of the assignment. On May 15, 1958 another demand was made on Midstates by letter requesting offset to be drilled to Wells A–1 and 5. A similar demand letter was written on October 13, 1958 relating to the same wells. It is undisputed that no wells were ever drilled by appellants on the 108.-4 acre tract.

On June 24, 1959 Whelan addressed a letter to appellants, received on June 26, 1959, saying that notice and proof is furnished "herewith" as to completion of Killingsworth-Alvarez Wells A–1, A–2 and A–3, and also Killingsworth-Elias Harper Estate Well #E–1. To this letter was attached Railroad Commission Forms showing the initial potential production test of each of said wells. This letter contained a demand to "commence operations" (for drilling of offset wells) within ninety days from date of receipt of said letter.

Following receipt of the letter of June 24, 1959 Killingsworth entered into a

farm-out agreement with Tennessee Gas Transmission Company, the then owner thereof, covering the 108.4 acres in controversy; obtained a permit from the Railroad Commission of the State of Texas to drill an offset well and incurred considerable expense in building a road and clearing a location preparatory to spudding in such well. However, Whelan and Messenger filed this lawsuit on August 5, 1959, forty days after receipt of such letter, and prior to the expiration of the ninety day period stated in the letter of demand. Thereupon all work preparatory to drilling of said well or wells was stopped.

The case was submitted to the jury upon nine special issues. In answer to issues one through six the jury found that the Killingsworth-Alvarez Wells A-2, A-3 and Elias Harper Well No. E-1 were commercial wells and that such wells were offset wells, as defined by the court in its charge. The jury found in answer to Special Issue No. 7 that the Killingsworth-Elias Harper Well #A-1 was not a commercial well and in answer to Special Issue No. 8 found that such well was an offset well. The jury found, in answer to Special Issue No. 9, that the Texas Company-Benefield & Singleton Well #5 was an offset well. No issue was submitted to the jury as to whether the Texas Company-Benefield & Singleton Well #5 was a commercial producing well.

Appellants' motion for judgment notwithstanding the verdict was overruled and the court entered judgment in favor of appellees for title and possession of the entire 108.4 acres in controversy.

### OPINION

Paragraph six of the assignment of oil and gas lease, copied above, is the keystone of appellees' cause of action. We find the terms and conditions contained therein to be clear and definite. By its express terms the assignment creates an estate in land which is vested in the assignee, with a condition subsequent. The agreement of the parties creates mutual or bilateral duties and responsibilities. As to the assignor certain conditions precedent must be complied with before he may demand enforcement of the condition subsequent requiring re-assignment of the property. First, there must come into existence a well or wells completed as (1) commercial producers and (2) offsetting the land. Secondly, assignor is required (1) submit to assignee *notice* and *proof* of the completion of such well or wells as (1) a *commercial producer* and (2) *offset* the land in question. (emphasis ours). Such having been done properly by assignor, it then devolves upon assignee to fulfill his part of the express obligation. First, upon receipt of the notice and proof aforesaid, he must, within ninety days after receipt of such notice and proof, begin actual operations for the drilling of a well to protect the property against such offset. Secondly, should assignee fail to do this then, at the end of said ninety day period, he, must suffer the consequences by reassigning *that portion of the lease that is due an offset on account of such commercial producer.* (emphasis ours).

There is an obligation on the part of the assignor to assume the burden of showing by a preponderance of the evidence that he has complied with his contractual obligations before he may enforce the recovery of the land by court decree. Many cases uphold the validity of such conditions precedent relating to reasonable notice in oil and gas leases. Burnett v. R. Lacy, Inc., Tex.Civ.App., 293 S.W.2d 674; Andretta v. West, Tex.Civ.App., 318 S.W. 2d 768; Kinnear v. Scurlock Oil Co., Tex. Civ.App., 334 S.W.2d 521; Southwestern Associated Telephone Co. v. City of Dalhart, Tex.Civ.App., 254 S.W.2d 819.

The gravamen of this appeal revolves around the question of whether the parties have lawfully complied with their respective contractual duties and obligations. Appellants' primary contention is that appellees

have failed to demonstrate that they have discharged their various contractual obligations, and therefore may not recover the land through the enforcement of the condition subsequent. After a careful review of the entire record we agree with appellants.

In their fifteenth point appellants assert that the trial court was without authority to render judgment based upon appellees' cause of action in trespass to try title. In essence appellants contend that appellees' cause of action is really one to cancel the assignment of oil and gas lease of December 26, 1942 and since appellees only had an equitable right to a conditional cancellation of said assignment they cannot prevail in trespass to try title inasmuch as in such an action it is encumbent to prove that they were the owners of the legal or equitable title to the property involved. We cannot agree with appellants' contention that trespass to try title is an improper form of action in a case of this kind. In Olsan Bros. v. Miller, Tex.Civ.App., 108 S.W.2d 856 the identical question was presented wherein the suit for trespass to try title was in fact one for cancellation of an assignment of an oil and gas lease for failure to develop. The court there held that trespass to try title was the proper form of action citing Kauffman v. Brown, 83 Tex. 41, 18 S.W. 425. Accord: Stanolind Oil and Gas Co. v. State, 136 Tex. 5, 133 S.W.2d 767; Id., 136 Tex. 5, 145 S.W.2d 569; Yates v. State, Tex.Civ.App., 3 S.W.2d 114; Hardy v. Beaty, 84 Tex. 562, 19 S.W. 778; Watkins v. Certain-Teed Products Corp., Tex. Civ.App., 231 S.W.2d 981, and an Article by A. W. Walker, 6 Tex.Law Rev. 129. Appellants' fifteenth point is overruled.

Appellants' eighth point contends that the answers of the jury to Special Issues numbered 1, 2, 3, 4, 5. and 6 as related above do not determine any issues upon which a judgment could be rendered in favor of appellees. Appellants contend that even if such findings were supported by the evidence yet appellees are not entitled to judgment based upon such findings because no notice and proof was submitted to appellants showing that either of the three wells in question had been completed as commercial producers until appellants received the demand letter from appellees dated June 24, 1959 and that this lawsuit was filed on August 5, 1959, less than ninety days after the receipt by appellants of such demand letter, such being in derogation of the express terms and conditions of the assignment in question. Moreover, appellants contend, as shown above, that Killingsworth commenced operations for the drilling of an offset well on the lease in controversy to protect the lease from drainage by the wells to the east, prior to the institution of this lawsuit, and that appellants were prevented from protecting the lease by reason of the premature filing of this case. Whelan admitted that he knew Killingsworth was clearing a location for the well before the lawsuit was filed. Under the undisputed evidence in this record it is clear that appellants were prevented by appellees from protecting the lease in controversy and from complying with the demand letter of June 24, 1959 by reason of the premature filing of the lawsuit. Paragraph six of the assignment, as well as the demand letter from appellees dated June 24, 1959, are clear and express in their terms that appellants were given ninety days after the receipt of such demand in which to begin the operation to prevent drainage from offset wells. It is well settled that in a situation such as this where a forfeiture is attempted by a lessor he cannot complain if the lessee suspends operations under the contract, pending the determination of the asserted right of the lessor to forfeit or cancel. Kothmann v. Boley, Sup.Ct., 156 Tex. 56; 308 S.W.2d 1; 3 Summer's Oil and Gas 112–113, Sec. 451. Morgan v. Houston Oil Co., Tex.Civ.App., 84 S.W.2d 312, 313; Lane v. Urbahn, Tex.Civ.App., 246 S.W. 1070 wr. ref.; Edgar v. Bost, Tex.Civ.App., 14 S.W.2d 364; Johnson v.

Montgomery, Tex.Civ.App., 31 S.W.2d 160, wr. ref.; Gwynn v. Wisdom, 119 Tex. 320, 30 S.W.2d 298; Wisdom v. Minchen, Tex. Civ.App., 154 S.W.2d 330, err. ref. w. o. m.

■ Appellees assert that their letter of June 24, 1959 was not the first demand made concerning the wells to the east of the lease. They point to the fact that Messenger went to Houston in April of 1959 and had a conference with Tennessee Gas Transmission Company and with Mr. Ralph Graham, President of Tennessee, "who had all the data at his finger tips concerning the wells surrounding this lease." Messenger states that during this conversation he discussed all of the wells existing and surrounding the lease and particularly the wells on the east. We are of the opinion that this testimony, as well as other portions of testimony dealing with conversations between the parties, is insufficient to acquit appellees of their duty and obligations to furnish "notice and proof" relating to the three wells in question. While it may be true that Ralph Graham had the data relating to the wells at his finger tips, yet this fact begs the question as to whether appellees furnished the notice and proof required of them in order to discharge the conditions precedent contained in the assignment. Moreover, the letter of June 24, 1959, specifically gives to appellants ninety days from receipt of that letter to comply with the terms of the assignment. Appellees precluded the performance of appellants' obligations by prematurely filing this case and they therefore cannot be heard to complain of appellants' failure to perform. Appellants' eighth point is sustained.

■ We also agree with appellants' contention contained in its first point that appellees have failed to discharge their burden by proving what portion of the 108.4 acres in controversy they were entitled to recover. The judgment of the trial court, based upon jury findings concerning four commercial producers and offsets on both the east and west sides of the lease, decreed a divestiture of title from appellants to appellees of the entire 108.4 acres. Appellees contended that appellants had failed to drill four offset wells, offsetting the four commercial wells found by the jury to exist, and since the field rules promulgated by the Railroad Commission of Texas for the Kildare Field, within which this lease is situated, provide for forty-acre spacing, it is apparent that the trial court awarded appellees the entire 108.4 acres on the theory that four wells, each within a 40 acre area would amount to an excess of the total amount of acreage in controversy. From what we have said in connection with sustaining appellants' eighth point it is apparent that, after disposing of the three wells on the east side of the tract, there is no justification for re-assignment of the entire lease except for a possible offset of the one well on the west side.

■ It is again important to note that paragraph six of the assignment in question specifically provided that failure to offset would result in an obligation on the part of appellants to reassign to appellees "that portion of the lease which is due an offset". (emphasis ours) Each letter of demand made by appellees to appellants contained this specific request, that is, that a well be drilled to offset a certain well or that an assignment be given covering that part of the lease due an offset. There is no testimony in this record on behalf of appellees as to what portion of the 108.4 acres in controversy appellees would be entitled to recover as an offset to any particular well. While it is true that the testimony reveals the field rules of the Railroad Commission do provide for forty-acre spacing, the question arises, what forty acres? What should be the shape or outline of the forty acres? It is our considered opinion that under the testimony in this case appellees cannot recover the entire 108.4 acres in controversy because of the Texas Company-Benefield & Singleton Well No. 5 on the west side because there is no evidence that this well alone would drain oil from beneath the entire 108.4 acres in controversy. We

believe that the burden of proof was upon appellees to establish the portion of the 108.4 acres which they were entitled to recover by virtue of the failure of appellants to complete any well or wells as offsets to a commercial producer.

■ It is elementary that in a trespass to try title case the burden is on the one claiming to recover land, or a part thereof, to identify the property which he may claim and to establish its location or show the extent of his interest in the particular tract. Masterson Irrigation Co. v. Foote, Tex.Civ.App., 163 S.W. 642, err. ref.; Hancock v. Moore, Tex.Civ.App., 137 S.W.2d 45, aff., 135 Tex. 619, 146 S.W.2d 369; Johnson v. Johnson, Tex.Civ.App., 275 S.W.2d 146; 41 Tex.Jur. 582, § 98; Permian Oil Co. v. Smith, (Sup.) 129 Tex. 413, 73 S.W. 2d 490.

■ By their third, fourth and fifth points, appellants contend that appellees have failed to discharge their burden of proof by giving notice and proof to appellants of the completing of the Texas Company-Benefield & Singleton Well No. 5 as a commercial producer, and also the three wells on the east side of the lease, as commercial producers, as required by the provisions of the assignment.

The record reveals that the only notice and proof submitted by appellees to appellants as to whether or not the various wells were commercial producers were the enclosures submitted with the demand letters. These enclosures consisted of the application to drill, and the plat attached thereto; the well record; and the potential test. The testimony of the various witnesses was to the effect that the potential test, standing alone, was insufficient to determine whether or not a well was a commercial producer. Whelan admitted that it was not possible to determine whether or not a well was a commercial producer solely by the information disclosed on the potential test and that it would be necessary to at least consider the production history from other wells in

the field similarly located. Appellees' engineering witness, Baumel, testified that, in his professional opinion, he could not look at the potential test alone, without anything else, and tell whether or not that well would be a commercial well. He said that he would have to take the potential test plus the potential test of the opposite wells and their production as well as all logs available. Messenger testified that a history of one day's production of a well does not reveal what the next well will be and that he would have to look at the subsequent production history of the well to tell whether or not it was a commercial producer. A great mass of technical testimony was introduced to show that a potential report, standing alone, would be insufficient to place a well in the category of a commercial producer. The trial court refused to submit an issue to the jury as to whether or not the Texas Company-Benefield & Singleton Well No. 5 was completed as a commercial producer.

■ In view of the undisputed record in this case concerning failure to submit proof relating to whether the offset wells in question were commercial producers, we are of the opinion that appellees wholly failed to comply with the conditions precedent relating to such notice and proof. Appellees lay great stress on certain testimony appearing in the record which would indicate that appellants had knowledge, from other sources, concerning the productivity of the wells in question. As stated above, this does not solve appellees' problem. What appellants may or may not have known, independent of information received from appellees in compliance with the terms of the assignment, is completely immaterial. The obligation of appellees under the assignment was certain and definite, that is, to furnish the notice and proof as a prerequisite for invoking the reassignment clause.

■ Nor do we think appellants waived the provisions of the assignment relating to notice and proof, or any other

provisions thereof. Waiver is an affirmative defense. It is an independent ground of recovery or defense and must be requested and submitted or it is waived. Waiver is an intentional surrender of a right known to exist and usually it is a question of fact. In this case waiver was not pleaded as a defense nor was any issue submitted to the jury concerning waiver. Accordingly, appellees' contention in this court concerning waiver is without merit. Terrell Hills Baptist Church v. Pawel, Tex.Civ.App., 286 S.W.2d 204; Ford v. Culbertson, 158 Tex. 124, 308 S.W.2d 855; Hancock Mutual Life Ins. Co. v. Esparza, Tex.Civ.App., 286 S.W.2d 695. Appellants' points three, four and five are sustained.

What we have heretofore said in disposing of appellants' eighth point renders it unnecessary to discuss points six and seven relating to the premature filing of this case.

Point nine is likewise sustained. By this point appellants say that the jury's answer to Special Issues Seven and Eight are insufficient to support the judgment. The answer of the jury to these issues completely eliminates Killingsworth-Elias Harper Well A–1 from consideration within the meaning of the assignment in question since it is found to be not a commercial producer.

We overrule appellants' point two wherein it is contended that Midstates Oil Corporation's well No. C–1 is an offset well to the Texas Company-Benefield & Singleton Well No. 5 as a matter of law. The testimony relating to this question is contradictory in nature to such an extent that it cannot be said, as a matter of law, that such well was actually an offset well.

By its points ten, eleven, twelve and thirteen, appellants assail the judgment on the theory that appellees had failed to discharge the burden of proving that a reasonable and prudent operator, under the same or similar circumstances, would have drilled wells on the 108.4 acres in controversy adjacent to the various wells in question on both the east and west sides of the lease. We cannot agree with appellants that "the reasonable and prudent operator" test is applicable under the facts so presented here. The record does reveal a large amount of testimony relating to the economics of drilling wells in the area. We think that there was a requirement to drill *vel non* contained in the assignment in question. The assignment was an express agreement to drill under certain circumstances and not an implied covenant to drill, as in the ordinary oil and gas lease requiring an offset to properly develop the property. The cases relied upon by appellants are chiefly those involving the implied obligation of a covenant to drill rather than an express covenant. Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774. The duty of the lessee to prevent drainage ordinarily requires him, in the absence of contrary agreement, to drill necessary offset wells, but where there is an express provision covering the subject the court will not imply inconsistent obligations. Burt v. Deorsam, Tex.Civ.App., 227 S.W. 354; 2 Summer's Oil & Gas, § 334, p. 523. Appellants' points ten, eleven, twelve and thirteen are overruled.

We have carefully considered appellants' fourteenth point and finding the same to be without merit, same is overruled.

The record presented here convinces us that the case has been fully developed upon the issues before the trial court and therefore, in view of our conclusions herein announced, we should render the judgment that appellees be denied recovery. However, it should be clearly understood that our decision herein does not foreclose appellees from asserting further rights and remedies under the assignment in question which they may elect to do.

Reversed and rendered.