

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-18-00129-CV

Stanton P. **BELL**, et al.,
Appellants/Cross-Appellees

v.

**CHESAPEAKE ENERGY CORPORATION**, et al.,
Appellees/Cross-Appellants

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CI22093
Honorable Cathleen M. Stryker, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:       Rebeca C. Martinez, Justice
               Irene Rios, Justice
               Beth Watkins, Justice

Delivered and Filed: March 13, 2019

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

This is a permissive accelerated appeal. *See* TEX. R. CIV. P. 168; TEX. R. APP. P. 28.3; TEX. CIV. PRAC. & REM. CODE § 51.014(d). It involves the interpretation of two Oil, Gas and Mineral Leases[1] ("Leases") agreed by the parties to be representative of numerous leases involved in multidistrict litigation referred to as *In re: Chesapeake Eagle Ford Royalty Litigation.* Appellants/Cross-Appellees (collectively referred to as "Bell"[2]) sued Appellees/Cross-Appellants

---

[1] The two leases are the November 12, 2009 Bell Lease ("Bell Lease") and the April 27, 2010 Ward Lease ("Ward Lease").

[2] To avoid confusion, when the discussion relates only to the Ward Lease, the lessors will be referred to as "Ward."

(collectively referred to as "Chesapeake") asserting a multitude of claims, including a claim for breach of contract by failing to pay Compensatory Royalty as provided for under the Leases. The issues certified by the trial court, and accepted by this court, for permissive interlocutory appeal are:

1. Under the unambiguous provisions of the Leases, is the formula for calculating Compensatory Royalty based on take points of the Adjacent Well within the triggering distance(s) set forth in the Leases?

2. Under the unambiguous provisions of the Leases, does the reasonably prudent operator standard apply, in whole or in part, to the lessee's offset obligations?

The first issue is the subject of Bell's appeal; the second issue is the subject of Chesapeake's cross-appeal.

**Facts**

Both issues presented in this case require interpretation of the language of the Leases. And, while the Leases contain similar provisions, there are some variations in the language employed. For that reason, we set out the relevant language of each Lease in detail.

*Language contained in both Leases:*

**ROYALTY – OIL GROSS PROCEEDS DEFINITION.** "Gross Proceeds" as used herein shall mean the total proceeds received by Lessee for any sale of Oil or condensate; . . . .[3]

**ROYALTY – GAS GROSS PROCEEDS DEFINITION.** "Gross Proceeds" as used herein shall mean the total proceeds received by Lessee for any sale of such Gas; . . . .[4]

**HORIZONTAL OR VERTICAL WELLS.** A "Horizontal Well" shall mean a well where it is necessary to cut a window for the purpose of drilling horizontally a distance of over thirty (30) feet from the vertical well bore and for which the TRC or the appropriate state agency requires directional or inclination surveys to be filed and a "Vertical Well" shall mean a well having a vertical drain hole which shall not be deviated from the vertical except randomly to straighten a hole which has

---

[3] Section 4C in the Bell Lease; section 3C in the Ward Lease.
[4] Section 4E in the Bell Lease; section 3E in the Ward Lease.

become crooked in the normal course of Drilling, or to sidetrack a portion of a hole because of mechanical difficulty in Drilling.[5]

*Language contained in the Bell Lease:*

**18.     OFFSET REQUIREMENT AND COMPENSATORY ROYALTY.** In the event a well ("Adjacent Well") producing Oil or Gas in Paying Quantities is drilled and completed after the date of this Lease on land under which Lessor does not own the quantity of minerals or royalty as under the lands covered by this Lease, and such Adjacent Well is draining the Leased Premises or is deemed draining if the Adjacent Well is located within three hundred thirty (330) feet of the Leased Premises, or, when Lessee has an economic interest in said Adjacent Well and said Adjacent Well is located within four hundred sixty seven (467) feet of the Leased Premises (in the case of a Vertical Well, distance will be measured from the surface location or bottom hole location of the Adjacent Well, whichever is closer; in the case of a Horizontal Well distance will be measured from the surface location or the subsurface path of a horizontal drainbore, from its point of entry into the productive horizon to its terminus, whichever is closer), then Lessee agrees to drill such offset wells which is [sic] reasonably designed to protect the Leased Premises from drainage, or at the option of Lessee, shall pay to Lessor the Compensatory Royalties set forth below, or execute and deliver to Lessor a release in recordable form releasing acreage in an amount equivalent to the number of acres required or permitted by the Texas Railroad Commission to drill an offset well to the formation of such Adjacent Well. Lessee shall have ninety (90) days from the date of first production of such Adjacent Well within which to Commence Actual Drilling Operations of an offset well or release offsetting acreage, and thereafter, Lessee's sole obligation shall be to pay Compensatory Royalties as set forth herein. . . .

In lieu of Drilling an offset well required hereunder or releasing acreage as provided above, then Lessee shall pay to Lessor as a Compensatory Royalty an amount equal to the Royalty Share of Gross Proceeds of production from the Adjacent Well . . . .

*Language contained in the Ward Lease:*

**17.     DUTY TO EXPLORE DEVELOP AND PROTECT.** Lessee also hereby expressly covenants and agrees to diligently and fully explore, develop, and protect the Leased Premises as a reasonably prudent operator.

**18.     OFFSET REQUIREMENT AND COMPENSATORY ROYALTY.** In the event a well ("Adjacent Well") producing Oil or Gas in Paying Quantities is drilled and completed after the date of this Lease on land under which Lessor does not own the quantity of minerals or royalty as under the lands covered by this Lease, and such Adjacent Well is draining the Leased Premises or is deemed draining if the Adjacent Well is located within the spacing distance as set in the current field

---

[5] Section 7D in both Leases.

rules as promulgated by the Railroad Commission of Texas but must do so if the adjacent well is within four hundred sixty-seven (467) feet of the Leased Premises, distance will be measured from the surface location or bottom hole location of the Adjacent Well, whichever is closer; in the case of a Horizontal Well distance will be measured from the surface location or the subsurface path of a horizontal drainbore, from its point of entry into the productive horizon to its terminus, whichever is closer), then Lessee shall within one hundred eighty (180) days after commencement of production from such Adjacent Well, Commence the Actual Drilling Operations for the Drilling of an offset well on the Leased Premises and diligently pursue such Operations to the horizon in which such Adjacent Well is producing, or at the option of Lessee, shall pay to Lessor the Compensatory Royalties set forth below, or execute and deliver to Lessor a release in recordable form surrendering acreage in an amount equivalent to the Well Tract of the Adjacent Well. . . .

> In lieu of Drilling an offset well required hereunder, Lessee shall pay to Lessor as a Compensatory Royalty an amount equal to the Royalty Share of gross proceeds of production from the Adjacent Well . . . .

Bell alleges that Adjacent Wells have been drilled within the distances stated in the Leases, and that Chesapeake has not drilled offset wells, released acreage, or paid Compensatory Royalties pursuant to Paragraph 18.

Chesapeake filed a motion for summary judgment seeking to establish that the Leases incorporate a "reasonably prudent operator" standard into Paragraph 18. The MDL court denied the motion, stating,

> under the unambiguous provisions of the Leases, the reasonably prudent operator standard does not govern performance of the lessee's offset obligations. For drainage claims under the "deemed drainage" provision, under the unambiguous provisions of the Leases, Plaintiffs are not required to show either: (1) actual, substantial drainage or (2) that a reasonably prudent operator under same or similar circumstances would drill an offset well to protect against substantial drainage and with a reasonable expectation of profit.

This ruling is the subject of Chesapeake's cross-appeal.

Chesapeake also filed a motion for summary judgment seeking to establish that Compensatory Royalty should be computed based on production only from take points within

certain trigger distances stated in the Leases rather than production from the entirety of a horizontal well. The MDL court granted that motion, in part, stating,

> Compensatory Royalties shall be calculated based on their Royalty Share (where appropriate, diluted by Unit percentage) of the production volume allocable and attributable to the perforated portion of the well, i.e. the "take points," located within the deemed drainage trigger distance(s) set forth in the Lease(s), as a percentage of the total perforated portion of the well bore of the deemed draining Adjacent Well. Construed in this way, the Compensatory Royalty provisions do not constitute an unenforceable penalty.

This ruling is the subject of Bell's appeal.

### Discussion

*Standards of review*

The interpretation of an unambiguous contract (including a mineral lease) is reviewed *de novo*. *Anadarko Petro. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002); *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 640 (Tex. App.—Austin 2000, pet. denied) (oil and gas lease is a contract and is interpreted as one). That review is guided by well-established principles of contract construction. Primary among these is the task of the reviewing court to "ascertain the true intentions of the parties as expressed in the writing itself." *Murphy Explor. & Prod. Co.—USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018). Thus, the starting point for contract construction is necessarily its express language. *Id.* Even so, a court may "consult the facts and circumstances surrounding a negotiated contract's execution to aid the interpretation of its language." *URI, Inc. v. Kleberg Cnty*, 543 S.W.3d 755, 757 (Tex. 2018). But this principle is not without limitation:

> [S]urrounding facts and circumstances cannot be employed to make the language say what it unambiguously does not say or to show that the parties probably meant, or could have meant, something other than what their agreement stated. In other words, extrinsic evidence may only be used to aid the understanding of an unambiguous contract's language, not change it or create ambiguity.

*Id.* (internal quotation marks and footnotes omitted).

Finally, courts "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (internal quotation marks omitted). But this principle, too, may not be used to rewrite the parties' agreement: "[P]arties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures . . . ." *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 280 (Tex. App.—San Antonio 2013, no pet.) (quoting *Provident Fire Ins. Co. v. Ashy*, 139 Tex. 334, 162 S.W.2d 684, 687 (1942)); *see Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 374 (Tex. 2001) ("We will not now rewrite this lease's plain terms to give the Royalty Owners the benefit of a bargain they never made.").

*Distinctions between vertical and horizontal wells*

The disputes in this case arise primarily because of practical differences in the ways that vertical and horizontal oil and gas wells are drilled and function. A brief review of those differences is, therefore, instructive.

As explained by the supreme court in *Murphy*, vertical wells "effectively drain a surrounding area exhibiting high natural porosity and permeability." 560 S.W.3d at 110 (brackets omitted). Horizontal drilling, on the other hand, permits extraction of oil and gas "directly from the less permeable source rock." *Id.* at 111. "The locations of both the vertical portion of a horizontal well and the nonperforated portions of the horizontal wellbore are essentially irrelevant for production purposes. Rather, the perforated portions of the horizontal wellbore are the points at which oil and gas is drained and produced from the surrounding rock." *Id.* (footnote omitted).

This court has also noted the practical differences between vertical and horizontal wells:

Production from a well, whether horizontal or vertical, is not obtained from the entire length of the well, but from the part of the well that pierces and drains the reservoir in which the hydrocarbons reside. A vertical well may produce hydrocarbons from different formations within its vertical line. A horizontal well only produces hydrocarbons from the part of the well that lies within the hydrocarbon-bearing reservoir, or "correlative interval." Along the horizontal displacement are takepoints through which hydrocarbons flow into the well.

*Springer Ranch*, 421 S.W.3d at 285.

Thus, the subsurface wellbore of a horizontal well may span several tracts of land but does not necessarily actually extract oil or gas from each of those tracts. *See id.* at 285 ("it is not the whole length of the well from which production is obtained").

*Paragraph 18*

Both of the issues before this court hinge on the construction of Paragraph 18 of the Leases. Chesapeake contends that the MDL court erred in construing its liability under that paragraph; Bell contends that the MDL court erred in construing the method for calculating Compensatory Royalty under that paragraph. The starting point of our analysis, then, must be a close inspection of the language of Paragraph 18.

Paragraph 18 begins by identifying as an "Adjacent Well" a well that is (1) "producing Oil or Gas in Paying Quantities," (2) "drilled and completed after the date of this Lease," (3) "on land under which Lessor does not own the quantity of minerals or royalty as under the lands covered by this Lease," and (4) either draining or deemed to be draining the Leased Premises. A well is deemed to be draining the Leased Premises if it is located within defined distances ("Trigger Distances") from the Leased Premises. If the Adjacent Well is drilled vertically, the Trigger Distance is "measured from the surface location or bottom hole location of the Adjacent Well, whichever is closer." If the Adjacent Well is drilled horizontally, the Trigger Distance is "measured

from the surface location or the subsurface path of a horizontal drainbore, from its point of entry into the productive horizon to its terminus, whichever is closer."

At this point, the language of the Bell Lease and the Ward Lease differ somewhat. Under the Bell Lease, Chesapeake "agrees [1] to drill such offset wells which is [sic] reasonably designed to protect the Leased Premises from drainage, or at the option of Lessee, shall [2] pay to Lessor the Compensatory Royalties set forth below, or [3] execute and deliver to Lessor a release in recordable form releasing acreage [in a sufficient amount] to drill an offset well to the formation of such Adjacent Well." If Chesapeake does not either commence drilling of an offset well or release sufficient acreage within ninety days of the date of first production of the Adjacent Well, it is obligated to pay the Compensatory Royalty.

Under the Ward Lease, within 180 days from the date production commences from the Adjacent Well, Chesapeake "shall . . . [1] Commence the Actual Drilling Operations for the Drilling of an offset well on the Leased Premises and diligently pursue such Operations to the horizon in which such Adjacent Well is producing, or at the option of Lessee, shall [2] pay to Lessor the Compensatory Royalties set forth below, or [3] execute and deliver to Lessor a release in recordable form surrendering acreage in an amount equivalent to the Well Tract of the Adjacent Well."

Thus, in broad terms, Paragraph 18 of each Lease provides Chesapeake with three alternative courses of action once an Adjacent Well begins production: (1) drill an offset well, (2) release sufficient acreage, or (3) pay Compensatory Royalty.[6] Chesapeake contends that these

---

[6] The Bell Lease excuses Chesapeake from these obligations if it has previously "completed a well producing from the same producing horizon as such Adjacent Well and at an offset location to which such Adjacent Well is completed and producing." The Ward Lease contains a similar provision excusing Chesapeake if it has previously "drilled a well at an offset location to such Adjacent Well, which is completed, and producing." These provisions are not at issue in this appeal.

obligations operate only within the confines of the reasonably prudent operator standard. In other words, Chesapeake need not perform any obligation under Paragraph 18 unless an Adjacent Well is substantially draining the Leased Premises and a reasonably prudent operator would drill an offset well to protect against that drainage with a reasonable expectation of profit from such a well. *See Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981). Bell contends, and the MDL court agreed, that the Paragraph 18 obligations apply when an Adjacent Well is deemed to be draining the Leased Premises, without regard to the reasonably prudent operator standard.

As noted, one of Chesapeake's Paragraph 18 options is to pay Compensatory Royalty, which both Leases define as "an amount equal to the Royalty Share of Gross Proceeds of production from the Adjacent Well." Bell contends that this means that Compensatory Royalty is calculated based on production from the entirety of a given Adjacent Well. Chesapeake contends, and the MDL court agreed, that, in the context of a horizontal Adjacent Well, Compensatory Royalty is calculated based on production only from those take points that fall within the Leases' Trigger Distances. Thus, Compensatory Royalty from a horizontal well whose take points do not all fall within the Trigger Distances is only a percentage or fraction of the production from the well as a whole.

Calculation of Compensatory Royalty is the subject of the primary appeal; liability is the subject of the cross-appeal. Because liability logically precedes compensation, we will address the cross-appeal first.

*Liability under Paragraph 18*

Chesapeake contends that its obligations under Paragraph 18 are qualified by the reasonably prudent operator standard. Under that standard, an operator need not drill an offset well to protect the leased premises from drainage unless there is proof "(1) of substantial drainage of the lessor's land, and (2) that a reasonably prudent operator would have acted to prevent substantial

drainage from the lessor's land." *Amoco*, 622 S.W.2d at 568. The second element is construed to excuse an operator from drilling an offset well if there is no reasonable expectation of profit. *See HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 889 (Tex. 1998); *Amoco*, 622 S.W.2d at 568.

Chesapeake contends that this reasonably prudent operator standard is expressly incorporated into the Leases, although by different terms.[7] We will therefore examine the specific language of each Lease in turn.

### *The Ward Lease*

Paragraph 17 of the Ward Lease states, "Lessee also hereby expressly covenants and agrees to diligently and fully explore, develop, and protect the Leased Premises as a reasonably prudent operator." Chesapeake contends that this provision imposes the reasonably prudent operator standard on every other provision in the Ward Lease, including the offset obligations in Paragraph 18. Ward contends that the more specific offset obligations in Paragraph 18 supersede the general covenant contained in Paragraph 17. We look first to the express language of Paragraph 18, and then address the application of Paragraph 17 in light of that express language.

Paragraph 18 of the Ward Lease states that, once a well is deemed to be draining the Leased Premises (*i.e.*, once a well is drilled within the Lease's Trigger Distances and begins production), Chesapeake

> shall within one hundred eighty (180) days after commencement of production from such Adjacent Well, Commence the Actual Drilling Operations for the Drilling of an offset well on the Leased Premises and diligently pursue such Operations to the horizon in which such Adjacent Well is producing . . . .

---

[7] Chesapeake clearly states in its briefing that it is not relying on any implied covenant to incorporate the reasonably prudent operator standard into the Leases. We will, therefore, analyze this issue only in terms of the Leases' express language. *See Magnolia Petro. Co. v. Page*, 141 S.W.2d 691, 693 (Tex. Civ. App.—San Antonio 1940, writ ref'd) ("when expressed covenants appear in the lease, implied covenants disappear"); *see also Foster v. Atl. Ref. Co.*, 329 F.2d 485, 491 (5th Cir. 1964) (express agreement supersedes and controls over implied covenant to protect against drainage).

This language is clear, direct, and mandatory. *See Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 131 (Tex. 2018) ("By its plain and common meaning, 'shall' denotes mandatory action."). Ward is not required to demonstrate anything other than the existence of an Adjacent Well within the Trigger Distances that has begun production. Once that is established, Chesapeake is required to drill unless it chooses one of two specifically-stated alternatives: "*or* at the option of Lessee, *shall* [1] pay to Lessor the Compensatory Royalties set forth below, *or* [2] execute and deliver to Lessor a release in recordable form surrendering acreage in an amount equivalent to the Well Tract of the Adjacent Well." (Emphasis added.) These alternatives are also clear, direct, and mandatory, and do not require any showing by Ward other than the existence of, and production by, an Adjacent Well.

Paragraph 18 of the Ward Lease thus contains one condition giving rise to three choices:

Condition:  a producing well is drilled within the Trigger Distances.
Choices:    drill an offset well, pay Compensatory Royalty, or release acreage.

Chesapeake seeks to impose two additional conditions and to grant itself an additional choice:

Conditions: a producing well is drilled within the Trigger Distances *and is actually substantially draining the Leased Premises, and drilling an offset well would reasonably be expected to return a profit*.
Choices:    drill an offset well, pay Compensatory Royalty, release acreage, *or do nothing*.

Chesapeake's construction contradicts the express language of the Ward Lease, particularly the language concerning deemed drainage. If Chesapeake has no obligation to drill, pay, or release acreage unless an Adjacent Well is actually substantially draining the Leased Premises, then the "deemed draining" language has no meaning. But well-settled rules of construction require that we give every term of a mineral lease meaning and effect. *See Anadarko*, 94 S.W.3d at 554 (presume parties intend every clause to have effect). The express "deemed draining" term therefore precludes imposing on Ward a requirement to prove actual substantial drainage.

The language of Paragraph 18 of the Ward Lease—both what is included and what is not—distinguishes that lease from those at issue in the cases on which Chesapeake relies. For example, the lease at issue in *Mzyk v. Murphy Exploration & Prod. Co.—USA,* No. 04-15-00677-CV, 2017 WL 2797479 (Tex. App.—San Antonio June 28, 2017, no pet.) (mem. op.), contained a "drill, pay, or release" clause akin to Paragraph 18. But that clause also provided that "Lessee agrees to drill such offset well or wells on said lands (or attempt to complete for production any existing offset well or wells drilled by Lessee on said lands) *as a reasonably prudent operator would drill under the same or similar circumstances . . . .*" *Id.* at *1 (emphasis added).

This court, in *Mzyk*, held that the language "to drill such offset well or wells . . . as a reasonably prudent operator would drill under the same or similar circumstances" expressly incorporated the reasonably prudent operator standard into the lease's offset provision. *Id.* at *3. It also found it significant that the offset clause "contains no language suggesting the parties agreed to a presumption of actual or substantial drainage." *Id.* at *4. In contrast, Paragraph 18 of the Ward Lease *does* contain language establishing that the parties agreed to a presumption of actual drainage and *does not* contain language expressly incorporating the reasonably prudent operator standard.

Because of these significant differences in express lease terms, *Mzyk* is of no assistance in construing Paragraph 18 of the Ward Lease. The same is true of *Menking v. Tar Heels Energy Corp.*, 621 S.W.2d 447 (Tex. Civ. App.—Corpus Christi 1981, no writ), and *Good v. TXO Prod. Corp.*, 763 S.W.2d 59 (Tex. App.—Amarillo 1988, writ denied), on which Chesapeake also relies. The offset provisions in each of those cases stated that, if a well was drilled on adjacent property "and [was] draining the leased premises," the lessee agreed "to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances." *Menking*, 621

S.W.2d at 448 (emphasis added); *Good*, 763 S.W.2d at 59-60 (same). *Menking* and *Good* are thus distinguishable from the case before us for the same reasons as is *Mzyk*.[8]

If *Mzyk*, *Menking*, and *Good* have any bearing on this case, it is to illustrate how parties may easily incorporate the reasonably prudent operator standard into the offset clause of a mineral lease, if that is what they intend. The absence in Paragraph 18 of the Ward Lease of language like that included in the *Mzyk*, *Menking*, and *Good* leases reinforces our conclusion that Paragraph 18 does not incorporate the reasonably prudent operator standard.

We note that Chesapeake also relies on *Good* for the proposition that lease language triggering an offset obligation when a neighboring well is "draining" the leased premises does not excuse the requirement that the lessor prove "substantial drainage." *See Good*, 763 S.W.2d at 61. Chesapeake argues that, similarly, the term "deemed draining" is not the same as "deemed substantially draining," and does not excuse Ward from having to prove actual substantial drainage. Chesapeake's argument puts the cart before the horse. Proof of substantial drainage was required in *Good* because "the parties expressly adopted the reasonably prudent operator standard." *Id.* But whether the parties incorporated the reasonably prudent operator standard into Paragraph 18 of the Ward Lease is the issue here. If it does not, "substantial" drainage from an Adjacent Well, deemed or actual, is immaterial. Indeed, using the phrase "deemed substantially draining" would indicate an intent to incorporate that standard because, otherwise, the word "substantially" would have no import. The fact that the parties did not include the word "substantially" reinforces the conclusion that they did not intend to incorporate the reasonably prudent operator standard into Paragraph 18.

---

[8] We also note that it was not contested in *Menking* that the reasonably prudent operator standard applied. *See Menking*, 621 S.W.2d at 448-49.

Chesapeake next relies on *Bryan v. Sinclair Oil & Gas Co.*, 1 S.W.2d 917 (Tex. Civ. App.—Galveston 1927, no writ), and *Tex. Pacific Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031 (1928). These case are also distinguishable based on the language of the leases at issue.

The lease in *Bryan* provided that, if a well was drilled on adjoining land within a specified distance, the lessee "shall proceed at once to faithfully and diligently protect by development" the leased premises. 1 S.W.2d at 918. The court held that this clause did not impose on the lessee a greater burden than an ordinarily prudent operator because there was "no specific agreement nor requirement to drill *vel non*.[9]" *Id.* at 919. Whether to drill an offset well was specifically qualified by the phrase "faithfully and diligently," a phrase akin to "reasonably prudent." No such qualifying phrase appears in Paragraph 18.

The lease in *Barker* required the operator to "give due protection to said merged tracts of land against all offset wells drilled on adjacent property near enough to require an offset on these merged tracts." 6 S.W.2d at 424. The court recognized this language as imposing an express obligation to protect against drainage, but noted that the lease was "silent as to how such protection was to be given." *Id.* at 431. It was because of this silence that the court "of necessity tested the lessee's performance by the standards of reasonable time and reasonable diligence." *Id.* at 432. The Ward Lease, in contrast, is not silent as to how Chesapeake is to protect the Leased Premises against drainage. It explicitly requires Chesapeake to drill an offset well, within a specified period of time and to a defined depth, when a well is drilled on adjacent land within specifically defined Trigger Distances. *Barker* is simply inapposite.

---

[9] "Vel non" is a Latin phrase which simply means "or not." *Vel non*, Merriam-Webster Online Legal Dictionary, https://www.merriam-webster.com/legal/vel%20non.

Paragraph 18 of the Ward Lease is similar to paragraph 6 of the lease at issue in *Middle States Petroleum Corp. v. Messenger*, 368 S.W.2d 645 (Tex. Civ. App.—Dallas 1963, writ ref'd n.r.e.). That paragraph stated that "Assignee will [within a specified period of time after receiving notice of a producing well] begin actual operations for the drilling of a well to protect said offset, or . . . reassign that portion of the lease that is due an offset . . . ." *Id.* at 647-48. The court there held that this language "was a requirement to drill *vel non*," that is, "an express agreement to drill under certain circumstances." *Id.* at 654. For that reason, the court concluded that the "reasonable and prudent operator test" did not apply. *Id.* (internal quotation marks omitted). The same is true here of Paragraph 18—it contains an express agreement to drill under certain circumstances which precludes application of the reasonably prudent operator standard.

Having determined that Paragraph 18 does not incorporate the reasonably prudent operator standard and, in fact, negates the "substantial drainage" element of that standard, we now address whether that standard nonetheless applies by virtue of Paragraph 17.

Chesapeake urges that the Ward Lease must be construed to incorporate the reasonably prudent operator standard into Paragraph 18 or else the Paragraph 17 agreement to "protect the Leased Premises as a reasonably prudent operator" would have no meaning. *See Anadarko*, 94 S.W.3d at 554 (presume parties intend each lease clause to have effect). In effect, Chesapeake argues that protecting the leased premises can only refer to protecting against drainage, *i.e.*, the duty to drill offset wells. It urges that, because Paragraph 17 limits the duty to protect to what a reasonably prudent operator would do, then any duty to drill offset wells under Paragraph 18 must be limited in the same way. The flaw in this argument is that the duty to protect against drainage

is only one part of the broader duty to protect the leased premises.[10] *Amoco*, 622 S.W.2d at 568 ("The implied covenant to protect against drainage is *part of the broad implied covenant to protect the leasehold.*" (emphasis added); *see HECI*, 982 S.W.2d at 889 ("Broadly categorized, we have recognized implied covenants to . . . protect the leasehold, which *includes* protection from local and field-wide drainage." (emphasis added)). Thus, the agreement to protect the Leased Premises as a reasonably prudent operator has meaning and effect even if it does not apply specifically to Chesapeake's offset obligations under Paragraph 18.

Ward argues that the broad covenant to protect stated in Paragraph 17 is superseded by the express terms concerning drainage stated in Paragraph 18 because specific contract terms control over general terms. *See Wells Fargo Bank, Minnesota, N.A. v. N. Cent. Plaza I, L.L.P.*, 194 S.W.3d 723, 726 (Tex. App.—Dallas 2006, pet. denied) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994)). Chesapeake contends that this argument renders Paragraph 17 meaningless because every other provision in the Lease is necessarily more specific than the general invocation of the broad covenants stated in Paragraph 17. But the determining factor is not simply that Paragraph 18 is more specific than Paragraph 17. It is that the specific terms of Paragraph 18 are incompatible with the general terms of Paragraph 17. It is because of this incompatibility that the specific duties stated in Paragraph 18 control over the general covenants stated in Paragraph 17.

Chesapeake acknowledges that there may be "irreconcilable tension" between the "deemed draining" language in Paragraph 18 and the reasonably prudent operator standard requirement of substantial drainage. As noted above, the incompatibility between the two is such that the "deemed

---

[10] Chesapeake repeatedly refers to Paragraph 17 as providing that the operator shall protect the lease from drainage. But the word "drainage" does not appear in that paragraph. Rather, the stated duty is simply "to protect the Leased Premises."

draining" language precludes incorporating the "substantial drainage" requirement into Paragraph 18. Chesapeake asserts that we should nevertheless incorporate the second element of the reasonably prudent operator standard, which would require Ward to prove that drilling an offset well would yield a reasonable expectation of profit. *See HECI*, 982 S.W.2d at 889; *Amoco*, 622 S.W.2d at 568.

The elements of the reasonably prudent operator standard are intertwined and cannot be divorced from one another. The first element requires proof of substantial drainage; the second requires proof that "a reasonably prudent operator would have acted to prevent that drainage." *Murphy*, 560 S.W.3d at 109 n.3; *see Amoco*, 622 S.W.2d at 568. The second element clearly refers back to the first. Proof that a reasonably prudent operator would have acted to prevent "that drainage" necessarily requires proof of the extent of "that drainage." In other words, a lessor would be required to prove that a sufficient amount of oil could be recovered from an offset well to cover the costs of such well and yield a reasonable expectation of profit. But, because drainage here is deemed, Ward is not required even to prove its actual existence. It would defy logic to nevertheless require him to prove there is actually a sufficient amount of drainage/potentially recoverable oil or gas to make drilling an offset well profitable.

Chesapeake also argues that failing to require Ward to prove that drilling an offset well would be economically beneficial leads to the absurd result of requiring it to drill offset wells that are unnecessary to protect against actual, substantial drainage. But Chesapeake agreed to the "deemed draining" term that negates the requirement of actual, substantial drainage, and that logically negates the requirement of proving economic benefit. We will not read the "deemed draining" term out of the agreement because Chesapeake now finds it objectionable. *See Springer Ranch*, 421 S.W.3d at 280 ("[P]arties make their own contracts, and it is not within the province

of this court to vary their terms in order to protect them from the consequences of their own oversights and failures.")

The express terms of Paragraph 18 evidence the parties' intent that the reasonably prudent operator standard does not apply to Chesapeake's obligation to drill an offset well, pay Compensatory Royalty, or release acreage. While Paragraph 17 may operate to incorporate that standard into other lease provisions that do not evidence a similar intent, it cannot operate to overcome the intent of Paragraph 18. We conclude that the reasonably prudent operator standard does not apply to Paragraph 18 of the Ward Lease.

### *The Bell Lease*

The Bell Lease does not contain a provision like Paragraph 17 of the Ward Lease. Instead, Chesapeake argues that the Bell Lease expressly incorporates the reasonably prudent operator standard in Paragraph 18 itself. Chesapeake relies on the following language: "Lessee agrees to drill such offset wells which is [sic] reasonably designed to protect the Leased Premises from drainage." Bell contends that this language relates only to how an offset well must be designed, not whether one must be drilled.

Bell urges that any uncertainty over the meaning of the phrase "reasonably designed to protect from drainage" is resolved by evidence of the parties' negotiations. Redline drafts of the Bell Lease demonstrate that one iteration of Paragraph 18 contained the language, "Lessee agrees to drill such offset wells *as a reasonably prudent operator would drill under the same or similar circumstances* which is reasonably designed to protect the leased premises from drainage." (emphasis added) The italicized language was later stricken, thus deleting any reference to the reasonably prudent operator standard. Chesapeake asserts that the MDL court erred by considering this extrinsic evidence and that this court should refuse to consider it.

"The parol evidence rule does not . . . prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as an aid in the construction of the contract's language, but the evidence may only give the words of a contract a meaning consistent with that to which they are reasonably susceptible . . . ." *URI, Inc.*, 543 S.W.3d at 765 (internal quotation marks omitted). "Understanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement*, but it is the parties' expressed intent that the court must determine." *Anglo-Dutch Petro. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) (emphasis in original).

This court employed these principles to consider evidence of redline drafts in *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723 (Tex. App.—San Antonio 2014, pet. denied). One draft of the lease at issue in that case contained the following language in a shut-in royalty clause: "If, at the expiration of the primary term—or at any time thereafter, there is located on the leased premises a well or wells capable of producing gas in paying quantities . . . Lessee may pay [to extend the lease term]." *Id.* at 736. "Capable of" was stricken in a later draft and replaced by the word "not." The final executed lease thus conditioned payment of shut-in royalty on there being "located on the leased premises a well or wells not producing oil/gas in paying quantities . . . ." *Id.*

The court acknowledged that the generally accepted meaning in the oil and gas industry of the term "shut-in royalty" requires the existence of a well capable of producing in paying quantities at the time it is shut-in, even if the shut-in royalty clause does not mention capacity for paying production. *Id.* (citing *Hydrocarbon Mgmt., Inc. v. Tracker Exp., Inc.*, 861 S.W.2d 427, 432-33 (Tex. App.—Amarillo 1993, no writ)). It also acknowledged that this general legal principle would appear to apply to the construction of the lease at issue. *Id.* However, the court concluded that the parties did *not* intend for that principle to apply because, "[w]hen the parties' negotiations as reflected in the lease drafts are considered, . . . an express reference to 'capable of' producing in

paying quantities was stricken . . . ." *Id.* "Quite simply, the parties could not have intended for the law to engraft into their agreement the very language they removed." *Id.* at 737.

The Bell Lease presents the same circumstance as that considered by the court in *PNP Petroleum*. Chesapeake would have us engraft into that lease the very language that the parties removed—the reasonably prudent operator standard. But, as in *PNP Petroleum*, the fact that the parties affirmatively removed that standard evidences their intent that it not apply to the offset well obligations. We will not rewrite the parties' agreement to reinsert that standard as that would be contrary to the parties' expressed intent.[11]

Given that the parties removed the reasonably prudent operator standard from Paragraph 18, we cannot read "reasonably designed to protect from drainage" as imposing the same requirements as the removed standard. In this respect, we reject Chesapeake's contention that the original version, which contained both "reasonably prudent operator" and "reasonably designed to protect from drainage" language, was simply redundant. If the two original phrases did mean the same thing, one would expect that the parties would have chosen to retain the well-established and time-tested articulation of that meaning—"reasonably prudent operator"—rather than one that apparently has not been construed by any Texas appellate court. The intentional deletion of the reasonably prudent operator language must be given effect.

Finally, considering the redline drafts and giving effect to the parties' intention as evidenced by deletion of the reasonably prudent operator language does not vary or contradict the language the parties retained. "Reasonably designed to protect from drainage," according to its plain language, refers to the design of an offset well, not to whether Chesapeake is required to drill one. This construction gives the phrase practical meaning, especially in light of the supreme court's

---

[11] Chesapeake concedes that *PNP* supports, if not requires, consideration of the redline drafts in this case. It asserts, though, that *PNP Petroleum* was wrongly decided and urges this court to overrule it. We decline that invitation.

recent opinion in *Murphy*, as such design would encompass not only how, but where an offset well should be drilled.

The lease in *Murphy* required the operator to drill an offset well if a well were drilled on adjacent land within a specified distance from the leased premises. 560 S.W.3d at 107. The lease required that such an offset well be drilled "to a depth adequate to test the same formation from which the well or wells are producing from [sic] on the adjacent acreage." *Id.* It did not otherwise specify where on the leased premises the offset well must be drilled. *Id.* In addition, the offset provision did not incorporate the reasonably prudent operator standard and did not mention drainage. *Id.*

The supreme court rejected the lessor's contention that the offset clause necessarily was intended to protect against drainage and thus required that the offset well be drilled in proximity to the draining well. *Id.* at 112. The court determined that, in the context of vertical drilling, it may be reasonable to interpret "offset well" as meaning one that protects against drainage. *Id.* But, in the context of horizontal drilling, it is reasonable to interpret "offset well" as meaning one that "serves to counterbalance or to compensate for a triggering well on the adjacent property." *Id.* at 113 (internal quotation marks omitted). The court thus concluded that the offset clause in the lease before it did not impose any proximity requirement. *Id.* at 113-14.

Unlike the lease in *Murphy*, the Bell Lease contains language demonstrating that the parties intended for the offset clause to operate in the context of drainage, whether actual or deemed. The requirement that Chesapeake drill "such offset wells which is [sic] reasonably designed to protect the Leased Premises from drainage" indicates an intent that the offset well be drilled in proximity

to the Adjacent Well.[12] Thus, the phrase "reasonably designed to protect from drainage" is given meaning and not rendered mere surplusage.

### *Conclusion on liability*

For the reasons stated above, we hold that the reasonably prudent operator standard does not apply to Paragraph 18 of either the Ward Lease or the Bell Lease. The MDL court therefore did not err by denying Chesapeake's motion for summary judgment seeking to incorporate that standard. That portion of the MDL court's order is affirmed.

We now address the compensatory royalty issue raised in the primary appeal.

## *Calculation of Compensatory Royalty*

The express language of the Leases defines Compensatory Royalty as "an amount equal to the Royalty Share of Gross Proceeds of production from the Adjacent Well." The term "Royalty Share" is defined in the Leases as specified percentages (*e.g.*, 22% of Gross Proceeds or 22% of Fair Market Value). The meaning of Royalty Share is not in dispute.

The term "Gross Proceeds" is defined in the Leases as "the total proceeds received by Lessee for any sale of [Oil or condensate/Gas]." Bell argues that Chesapeake's construction of the Leases contradicts the meaning of Gross Proceeds as "total" proceeds. Chesapeake, however, agrees that Gross Proceeds means "all" or "total" proceeds. The question is, total proceeds from what? The real point of contention is whether Gross Proceeds are from production from the entirety of a horizontal well, any part of which falls within the Trigger Distances, or production attributable only to those perforations (take points) that are within those Trigger Distances. Here, again, the answer lies in the language of the Leases.

---

[12] We do not purport to decide how *Murphy* applies to the lease provisions concerning previously-drilled wells "at an offset location." That issue is beyond the scope of this appeal.

The measure of Compensatory Royalty as stated in the Leases is "the Royalty Share of Gross Proceeds of production *from the Adjacent Well*." (emphasis added) An "Adjacent Well" is one "producing Oil or Gas in Paying Quantities . . . drilled and completed after the date of this Lease" and either draining the Leased Premises or deemed to be draining that property because "said Adjacent Well is located within" specified Trigger Distances from the Leased Premises. Significantly, the parties expressly provided for how to determine whether a horizontal Adjacent Well is within those Trigger Distances (*i.e.*, is deemed to be draining the Leased Premises): "in the case of a Horizontal Well distance will be measured from the surface location or the subsurface path of a horizontal drainbore, from its point of entry into the productive horizon to its terminus, whichever is closer." (emphasis added)

Given this express provision, Chesapeake's Paragraph 18 obligations are triggered if a horizontal Adjacent Well is drilled such that the surface location of that well is within the Leases' trigger distances, regardless of whether that well thereafter runs parallel or perpendicular to, or toward or away from, the Leased Premises. In fact, measuring the location of a horizontal Adjacent Well by its surface location occurs only if that surface location is closer to the Leased Premises than is the horizontal drainbore. In such a case, the drainbore necessarily runs away from the Leased Premises.

The surface location of a horizontal well is not the actual point of production. *See Murphy*, 560 S.W.3d at 111 (perforated portions of horizontal wellbore are where minerals are drained and produced from rock); *Springer Ranch*, 421 S.W.3d at 285 (take points are where hydrocarbons flow into horizontal well). Even so, the parties specifically agreed that a horizontal well is deemed to be draining the Leased Premises (and triggers Paragraph 18 obligations) even if only its surface location is within the Trigger Distances. Chesapeake's insistence that only the location of horizontal well take points is relevant to its Paragraph 18 obligations impermissibly negates this

express contract provision. *See Murphy*, 560 S.W.3d at 108 (courts must give effect to all contract provisions so none are rendered meaningless).

Similarly, the alternate measure point of a horizontal well—"the subsurface path of a horizontal drainbore, from its point of entry into the productive horizon to its terminus"—does not depend on, or even account for, where actual production takes place. While the parties could easily have provided for measuring the location of a horizontal Adjacent Well from take points along the horizontal drainbore, they did not. Instead, they employed language describing the entire length of the drainbore, not discrete take points.

Chesapeake's argument that only take points are relevant is, in effect, an argument that take points within the Leases' Trigger Distances and take points outside of those distances should be treated as separate wells for purposes of applying Paragraph 18. In fact, Chesapeake states in its brief that "[e]ach take point essentially functions as a separate underground well." Chesapeake also states that the central aspect of its position on interpreting Compensatory Royalty is that production from a horizontal well is not from the entire length of the well, but only from take points where the horizontal wellbore is perforated. We look instead to the language contained the Lease.[13]

As established by the plain language of the Leases, and as recognized by Chesapeake's own expert, "[t]he trigger distances in the offset clauses of the Plaintiff's leases . . . do not distinguish between horizontal wells and vertical wells, and do not distinguish between wells drilled perpendicular to or parallel to the lease or unit line." Thus, any interpretation of the offset clauses must apply equally to horizontal and vertical wells.

---

[13] The Lease language states that the location of a horizontal Adjacent Well is determined by reference to the surface location of the well or the entirety of the horizontal drainbore, "from its point of entry into the productive horizon to its terminus."

The Leases clearly speak of "Adjacent Well" in the singular (*e.g.*, "*a* well producing Oil or Gas"; "deemed draining if *the* Adjacent Well"; "gross proceeds from *the* Adjacent Well"). There is no language even implying that a single horizontal well should, or even may, be considered to be multiple Adjacent Wells, depending on the location of its take points. The Leases plainly identify horizontal wells in terms of the entirety of those wells (*e.g.*, "from its point of entry into the productive horizon to its terminus"), not as segmented into "mini-wells" defined by individual take points. Had the parties intended that a horizontal well be treated as a series of "take point" wells rather than one integrated whole, they could easily have said so. They did not, and we may not say so for them. *See Tenneco Inc. v Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("courts will not rewrite agreements to insert provisions parties could have included").

Chesapeake insists that this court must look beyond the language of the Leases and consider the "realities" of horizontal drilling as surrounding facts and circumstances that inform the court's construction of that language.[14] *See Murphy*, 560 S.W.3d at 110; *Springer Ranch*, 421 S.W.3d at 279. But the cases on which Chesapeake relies are distinguishable.

The leases in *Murphy*, like the Leases in this case, were "drafted with horizontal shale drilling in mind." 560 S.W.3d at 110. The difference, though, is that the *Murphy* leases did not expressly address the issue presented to the court for construction—whether a required offset well may be drilled anywhere on the leased premises or whether there was an implied requirement of proximity to the lease boundary. *Id.* at 108, 112. It was in the context of answering that question that the supreme court considered sources outside the four corners of the lease (primarily law journal articles) concerning how a horizontal well produces minerals and the unlikelihood of drainage between tracts. *See id.* at 111-12.

---

[14] We note that some of these "realities," such as the direction and extent of hydraulic fractures and the extent of drainage from take points, are hotly disputed by Bell.

In the present case, the Leases expressly address the issue presented. Compensatory Royalty is computed based on "production from the Adjacent Well." And, in the context of a horizontal well deemed to be draining the Leased Premises, an Adjacent Well is one whose surface location or subsurface path "from its point of entry into the productive horizon to its terminus" is within the Trigger Distances. This language clearly demonstrates that the parties were aware of the realities of horizontal drilling and made provision for those realities. Chesapeake may not now assert those "realities" to alter or contradict the unambiguous Lease language.[15] *See id.* at 109. Again, the parties could have fashioned a different calculation of Compensatory Royalty to account for the reality that production occurs only at the take points of a horizontal well. But they did not, and we will not do so for them. *See Tenneco*, 925 S.W.2d at 646.

*Springer Ranch* is likewise distinguishable based on the language of the agreements at issue. The contract in *Springer Ranch* provided that royalties on particular lands "shall be paid to the owner of the surface estate on which such well or wells are situated . . . ." 421 S.W.3d at 277. The question presented was whether a horizontal well that spanned multiple properties was situated on each of those properties or only on the property where the wellhead was located. *Id.* at 277-79. This court concluded that, "[i]n light of the contract's language, physical facts of the mineral and surface estates, and the applicable case law," the well was "situated 'on' more than one 'surface estate.'" *Id.* at 284.

The contract in *Springer Ranch* did not address how to determine where a horizontal well is situated. It was therefore appropriate for this court to consider "physical facts of the mineral and

---

[15] Chesapeake introduced these "realities" by way of an expert affidavit explaining the manner in which a horizontal well produces minerals, the geology of the Eagle Ford Shale, and the unlikelihood of drainage between tracts in the Eagle Ford shale. These explanations, even from an expert, cannot be employed to alter or contradict the plain meaning of the express language used in the Leases. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009) ("Experts have a proper (if confined) role in litigation, but it is not to supply parol evidence to vary or contradict the terms of unambiguous contracts.").

surface estates" to aid it in construing what the parties intended by the word "situated." But, in the case before us, the parties specifically stated how to determine the location of a horizontal well. There is no need for this court to go beyond the language of the Leases to construe their meaning. Further, even if the court were to consider extrinsic facts or circumstances, those facts or circumstances cannot be used to alter or contradict the actual language of the Leases. *See Murphy*, 560 S.W.3d at 108-109; *Springer Ranch*, 421 S.W.3d at 278-79.

Chesapeake also urges this court to follow the lead of the Austin Court of Appeals in *Luecke* and "decline to apply legal principles appropriate to vertical wells that are so blatantly inappropriate to horizontal wells." 38 S.W.3d at 647. But *Luecke*, too, is distinguishable. That case concerned the rule of capture, actual drainage, and the remedy for improper pooling of a horizontal well. The parties in *Luecke* executed a lease "prior to the surge of horizontal drilling and likely did not contemplate the possibility of horizontal wells." *Id.* at 638. The lease thus did not contain any provisions specific to horizontal wells and the court was left to determine how relevant legal principles would apply in the absence of such specific provisions. We are not in that position. The parties in this case both contemplated the drilling of horizontal wells and specified how the Leases would apply in that context. We are not at liberty to "decline to apply legal principles" that the parties could have, but did not, exclude in their agreements.

The gist of Chesapeake's argument is that calculating Compensatory Royalty according to the plain language of the Leases is a bad deal. Regardless, that is the deal the parties made and this court is not permitted to rewrite it under the guise of interpreting it. *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction."). Again, "parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them

from the consequences of their own oversights and failures." *Springer Ranch*, 421 S.W.3d at 280. This is especially so given that Chesapeake is a sophisticated business player that was represented by highly competent and able legal counsel who actively negotiated the Lease terms with the knowledge, and even expectation, that an Adjacent Well would be drilled horizontally. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180 (Tex. 1997) (recognizing significance of parties' business acumen and representation by able counsel in an arm's-length transaction).

We conclude that the MDL court erred by altering the method for calculating Compensatory Royalty specifically stated in the Leases. We hold that, according to that specific language, Compensatory Royalty is calculated by the Royalty Share of Gross Proceeds of production from the entirety of an Adjacent Well. Compensatory Royalty is not limited to production allocable only to take points within the Trigger Distances.

Chesapeake asserted in the court below that, if Compensatory Royalty is calculated according to the Lease language, it constitutes an unenforceable penalty. Bell urges this court to resolve this issue. It would not, however, be appropriate for us to do so.

The provision for a permissive interlocutory appeal is an exception to the general rule that only final judgments are appealable and is, therefore, strictly construed. *Lakes of Rosehill Homeowners Ass'n, Inc. v. Jones*, 552 S.W.3d 414, 418 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *White Point Minerals, Inc. v. Swantner*, 464 S.W.3d 884, 890 (Tex. App.—Corpus Christi 2015, no pet.). The scope of a permissive appeal is limited to consideration of the controlling question of law identified by the trial court. *See* TEX. R. CIV. P. 168; *White Point Minerals*, 464 S.W.3d at 890. "The parties may not add to the trial court's description of the controlling legal question." *Lakes of Rosehill*, 552 S.W.3d at 418.

Whether Compensatory Royalty, as determined according to the Leases' express language, is an unenforceable penalty is not a controlling question of law identified by the MDL court in

certifying this permissive interlocutory appeal. Indeed, it does not appear that the MDL court has rendered a decision on this issue. It is not our function, as a reviewing court, to decide this issue in the first instance, particularly in the context of a permissive interlocutory appeal. *See* TEX. R. APP. P. 33.1 (requiring ruling by trial court to preserve issue for appellate review). We therefore decline Bell's invitation to address the unenforceable penalty issue.

*Conclusion on Compensatory Royalty*

For the reasons stated above, Compensatory Royalty must be calculated according to the express term of the Leases—by reference to production from the entirety of an Adjacent Well, regardless of whether that well is vertical or horizontal, parallel or perpendicular, running toward or away from the Leased Premises. The MDL court erred by granting Chesapeake's motion for summary judgment redrafting the Compensatory Royalty clause to include only production allocable and attributable to portions of an Adjacent Well. That portion of the MDL court's order is reversed.

## Conclusion

That portion of the MDL court's order denying Chesapeake's Deemed Drainage Claims Motion (First Drainage Motion) is affirmed. That portion of the MDL court's order granting, in part, Chesapeake's Deemed Drainage Damages Motion (Second Drainage Motion) is reversed and judgment is rendered that Compensatory Royalty shall be measured by an amount equal to the Royalty Share of Gross Proceeds of production from the entire Adjacent Well.

Rebeca C. Martinez, Justice